BARNEY McCARNEY, by L. A. LECLAIRE, his next friend, v. BETTENDORF AXLE COMPANY, Appellant.

**Master and servant:** GUARDING DANGEROUS MACHINERY: FACTORY ACT: 1 CONSTRUCTION. Where specific descriptions in a statute of persons or things are followed by general words not so specific, the latter descriptions are to be construed as applicable to a class of persons or things alike or similar to those designated by the preceding specific descriptions; unless the specific words describe things of different classes, or include all things in their class, or an application of the rule would render the general words meaningless. The factory act providing that "all saws, planers, cogs, gearing, belting, shafting, set screws and machinery of every description shall be properly guarded," is construed as an exception to the general rule, in that the specific descriptions refer to machinery or parts of machinery different from one another, and therefore the term "machinery of every description" was intended to comprehend all machines of a character dangerous to employees operating them without proper guards.

**Same.** Wherever any machine is shown to be dangerous to em-
2 ployees when operated without proper guard, the requirement of the statute to guard the same becomes as mandatory as if the same was particularly described therein; and proof of its

operation unguarded makes a *prima facie* case of negligence. In the instant case the evidence is held to show a traveling crane is such a machine and requires guards.

**Same.** The fact that machinery is located some distance above the floor will not relieve the master of the duty of properly guarding it, if of such a character that injury to employees is reasonably to be apprehended when required to work about it.

**Same:** CONTRIBUTORY NEGLIGENCE. The evidence in this case is held insufficient to show as a matter of law that plaintiff was guilty of contributory negligence in placing his hand upon the track of a running crane.

**Same:** SAFE PLACE TO WORK: SUBMISSION OF ISSUE. It is also held that the evidence was sufficient to justify a finding that some provision for warning plaintiff of the approach of the crane was necessary to render the place where plaintiff was at work safe, and hence a submission of the employer's negligence in this respect was proper.

*Appeal from Scott District Court.*—Hon. D. V. Jackson, Judge.

TUESDAY, JUNE 25, 1912.

ACTION for damages resulted in judgment against the defendant, from which it appeals.—*Affirmed.*

*T. A. Murphy, Cook & Balluff,* and *A. G. Sampson,* for appellant.

*Ely & Bush* for appellee.

LADD, J.—The only question raised on this appeal is whether the evidence was such as to justify the court in submitting the case to the jury on either of two grounds of negligence: (1) Was the defendant negligent in operating the crane without guards, fenders, or some device to give warning of its approach? (2) Was it negligent in operating said crane after the ordinary hours of work without notice to plaintiff that it would be so operated?

That the questions involved may be fully understood, it will be necessary to state the facts fully.

The defendant operates a factory for the manufacture of steel cars. To move these and other heavy material from place to place in its shop, it employs three electric cranes. These are hung on wheels which move on tracks which are different heights and extend north and south. They hang between the tracks with the top about even with the tops of the wheels, and the operator sits· therein about six feet lower. The tracks for the large crane are twenty-four feet, those for the three-ton crane fourteen feet three inches, and those for the riveter crane eleven feet —— inches above the floor, and all rest on posts or timbers attached to the main post supporting the building. Starting from the south, the first or riveter post is a "box set in the ground and fits exactly a nine-inch I-beam, and on the beam is a two 6 x 6 bolt and imbedded in concrete, and the beam stands a foot below the angles. The south rail of the riveter crane track is supported on top of these I-beams." The next or the post, of the large crane, is a six-inch by twelve-inch timber, eight and one-half inches north of the riveter post and immediately against a twelve-inch by twelve-inch post supporting the building. About nine inches from the top of the riveter post is a block between it and the large crane post. A bolt, running through the three posts mentioned, and this block, holds them together. North of the post supporting the building and four inches therefrom is a six-inch by eight-inch post which supports what is called the "three-ton crane." Between these posts and the tracts are I-beams, that on which the large crane moves being a fifteen-inch, on which the three-ton crane runs a twelve-inch, and on which the riveter crane is operated a nine-inch, I-beam. From the large crane post, and flush with its south side, are knee braces extending from a point on either side three feet five and three-quarter inches higher than the riveter crane track up to the track on

which the large crane runs, giving it longitudinal stiffness. The south side of the large crane post is eight and one-half inches north from the center of the riveter crane track. The three-ton crane track is two feet ten and three-quarter inches higher and three feet five and one-half inches north of the riveter crane track. A one and one-quarter-inch iron air pipe extends parallel with and seven and three-quarter inches north and three-quarter inch above the riveter crane track. It appears that, in operating one of these cranes, one employee sat in and directed it, while another followed on the floor fastening on whatever was to be moved, and when properly placed unfastening the same. In the morning of the day on which plaintiff was injured, he was directed by the shop foreman to follow the large crane, and did so until about five o'clock p. m.; it being operated in moving cars under frames to the riveter benches and then from there to the inspector's or painter's benches about twenty feet distant. At the time mentioned, the crane proceeded to straighten up some car under frames which had tipped over, when he was advised by the foreman that he would have to work till a quarter to eight o'clock that evening. After some other work, by direction of the riveter, he attached to the crane the riveter which had been let down for repairs, and, when it was raised to the riveter crane tracks, he climbed up the south post to the south track, set the south wheels with flange in groove thereon, and proceeded to the north rail to set the other side.

He testified:

After I was halfway across, I looked down the north hole and saw this sixty-foot crane standing about one hundred feet away from me. There was nobody in the crane; nobody around it. When these cranes are being operated, some one has to be in the crane to operate it. After I saw this crane, I turned to go over to the north girder of this small crane there. The wheels of this small crane were about two inches away from the rail. In order

to get them in, I had to pull it like that; had to have both wheels straight. There was an eight-inch I-beam with a four-inch flange to stand on there at that time. There was a rail in the center of this I-beam. In order to pull this wheel over into the groove, I had to take hold of something. There was not enough to stand on to hold me. The only thing that there was that I took hold of was this girder or rail of the north crane. That was the north crane I had seen standing there without anybody around it. I took hold of the edge of the rail of that north crane. Then I turned around and started to pull on this end and looked up to set this right. I could not hold onto the girder that I took hold of first. I could not hang onto the girder that this rail was on. There was not anything else there in my reach that I could hang onto except this rail on this north crane. Then, as I turned around, this crane passed over my hand. It did not make any noise; I didn't hear it until it went over me. It was about two minutes after I had seen this crane standing back there before it ran onto my hand.

It appeared that the person operating the large crane did so on signals from plaintiff and was lifting the north wheels of the riveter crane when being pulled over, and that plaintiff could not well have pushed this crane instead of pulling it to the north in order to set the wheels on the track. The witness testified farther that he was not warned that the three-ton crane would be moved that evening, and that he was not aware it would, but supposed the operator had quit for the day; that he did not know that it was not provided with a brush or fender in front of its wheels to remove everything from the track as the crane approached; and that had there been, and his hand had been removed thereby, he could have saved himself from falling by the use of his other hand. And quoting: "When I climbed up to this track, I was doing in the usual way the same work that I had been doing all day; that is, straightening out the object to be lowered by the crane and being ready to cast off the fastenings when the

time came. I had to climb up in the work of following the crane. I had climbed up on top of these car underframes also about ten minutes before they had tipped over. When the crane was doing the work, it required somebody to climb up and get hold of what they were to lift and to cast off from it. I was the one to do that. So this Matthews was calling on me because I was the man whose place it was to do this work."

Plaintiff was twenty years of age, but had worked at the Joliet Bridge & Iron Company heating rivets and. where hand cranes on endless chains were used, after which he worked "firing a boiler" for a year. Then after a few months he was engaged by the Illinois Steel Company cutting bolts. For another company he bolted pieces to the cars, and his job was heating rivets which were carried where required by a hand crane, and later he helped fit, and then operated the air hammer which riveted the cars. He returned to the Illinois Steel Company for a time, where he seems to have merely carried oil for the engines. This company operated cranes like those of defendant, and he was shown how to do the work of following a crane by an employee of the latter before doing so alone.

Another witness, Greenwell, testified:

I know what appliances that are practicable are used in different establishments for the giving of warning of the approach of cranes generally. They are very different. Where a wheel is hung on a channel iron, if the channel iron extends beyond the wheel, there is usually a brush or broom intended for keeping anything off the rail. The distance in front of the wheel varies. Sometimes it is six, eight or ten inches past the wheel; they are constructed so different. If the wheel was an eighteen or twenty inch wheel, the brush would project about fifteen to eighteen inches. The effect of such a brush is that it would shove anything off the track. It is a practical device in general use. There is another construction where two fingers are bolted to the channel iron and extend out from eighteen to twenty inches with that brush or sweeper. Mostly all

cranes, or all firms that build cranes, they use a clamp so that, in case a wire was broke, or repairing the track, the track ain't safe to run on, they block a clamp right onto the rail so it will stop the crane there. That is to prevent it going any farther up than the block. Such a device as this is in general use for the purpose of stopping the crane if for any reason you did not want it to go any farther than a certain point. Such device is practicable for the protection of any one that is going upon the track of the crane, but they do not generally use it. There is no warning or signaling practicable and in general use as to the approach of a crane anywhere I know of except hollering, giving signals. In the large locomotive works, they use a whistle signal for handling the crane; that is, in giving warning of the approach of the crane.

One Kay, who operated the three-ton crane at the time of the injury, testified that he had done so for about three weeks; that the time in question was the only occasion when he was required to work over time; that at 5:45 o'clock he left the crane for the ground, but shortly afterwards, as directed, went into the crane and moved it about one hundred or one hundred and fifty feet to get end sills; that he was not instructed to keep a lookout for any one on the track, and from his position could not see anything on the rails unless he especially looked for it; that the crane was not equipped with brush or fender, and he did not know of passing over plaintiff's hand until after the injury.

I. The court stated the first ground of negligence as an issue, and in the fifth instruction propounded the question: "Did the defendant company operate an electric three-ton crane after regular work hours on or about August 3, 1909, unguarded and unprovided with fenders or other device for giving warning of its approach, and fail to take any steps to protect persons endangered thereby while doing the work in which plaintiff was engaged when injured, and, if so, did such action constitute negligence under the law?" This was followed by the ordinary defini-

tion of negligence, and, in the next instruction, the law of master and servant was expounded, but the statute concerning safety appliances was not alluded to, nor was the jury informed what bearing an answer to the question might have. From the statement of the issues in connection with the above instruction, the jury might very well have concluded that the issue was for their consideration, although paragraph 7 of the charge seems to have excluded every ground of negligence not referred to therein. The parties have fully argued whether the situation was such that the crane was required by the statute to be guarded, and, though appellee contends that the issue was not submitted, the question may as well be disposed of. The statute (section 4999-a2, Code Supplement) declares that: "It shall be the duty of the owner, agent, superintendent or other person having charge of any manufacturing or other establishment where machinery is used, to furnish and supply or cause to be furnished and supplied therein, belt shifters or other safe mechanical contrivances for the purpose of throwing belts on and off pulleys, and wherever possible, machinery therein shall be provided with loose pulleys; all saws, planers, cogs, gearing, belting, shafting, set screws and machinery of every description therein shall be properly guarded."

Appellant first contends that a traveling crane is not a machine such as contemplated by statute, for that it is not of the kind specifically enumerated therein. The argument is that in construing the sentence, "All saws, planers, cogs, gearing, belting, shafting, set screws and machinery of every description therein shall be properly guarded," the doctrine of *ejusdem generis* should be applied.

1. Master and servant: guarding dangerous machinery: factory act: construction.

Where words of a particular or specific description in a statute are followed by general words which are not so specific or limited, the latter, according to this doctrine, are to be construed as applicable to persons or things of

kind or class alike, or similar to those designated by the preceding particular or specific words, unless another intention is manifest. It usually restricts an expression in the statute such as "all others" or "any others" to persons or things of the same kind or class of those previously particularly designated, for the reason that this seems necessary to explain the use of both the general and the particular words. Otherwise, the particular words might as well have been omitted, as these are included in the general; but, if the general be restricted to the same kind, then all are given effect. The mere statement of the rule, however, indicates that it is subject to exceptions, as where the particular words are of things entirely different from one another and are of a different kind or class, or where the particular words include all of a kind or class. The doctrine is resorted to only as an aid to ascertaining the legislative intent, and must give way when its application would have the effect of rendering words or language employed in a statute meaningless which but for it might be accorded significance. *McReynolds v. People,* 230 Ill. 628 (82 N. E. 945); *Brown v. Corbin,* 40 Minn. 508 (42 N. W. 481). Sutherland, in his work on Statutory Construction, observes that, "when the result of thus restricting general words would be that they would have no effect at all, they must be extended to things superior in quality to those enumerated." And further: "The restrictions of general words to things *ejusdem generis* must not be carried to such an excess as to deprive them of all meaning. The enumeration of particular things is sometimes so complete and exhaustive as to leave nothing which can be called *ejusdem generis.* If the particular words exhaust a whole genus, the general words must refer to some larger class." Sections 278, 279. Other canons of construction are equally potent, and among these that the construction of a statute should be such as to give effect to the legislative

intent, and all words employed should be given their full meaning unless restricted by the context.

As said in *National Bank of Commerce v. Estate of Ripley,* 161 Mo. 132 (61 S. W. 588), with reference to the doctrine of *ejusdem generis*:

> This is only a rule of construction to aid us in arriving at the real legislative intent. It is not a cast-iron rule. It does not override all other rules of construction, and it is never applied to defeat the real purpose of the statute, as that purpose may be gathered from the whole instrument. It is a corollary to the first proposition above stated; that the statute must be construed to give effect to all its words. The rule itself must not be so construed as to defeat that purpose. While it is aimed to preserve a meaning for the particular words, it is not intended to render meaningless the general words. Therefore, where the particular words exhaust the class, the general words must be construed as embracing something outside of that class. If the particular words exhaust the *genus,* there is nothing *ejusdem generis* left; and in such case we must give the general words a meaning outside of the class indicated by the particular words, or we must say that they are meaningless, and thereby sacrifice the general to preserve the particular words. In that case, the rule would defeat its own purpose. (See, also, Gillock v. People, 171 Ill. 307 (49 N. E. 712).

It seems all but needless to point out that "saws" do not resemble "belting," and "cogs" can hardly be classed with "planers." Nor are "set screws" likely to be mistaken for "gearing." The particular things enumerated in our statute are of entirely different kinds or classes, and the general words might consistently be construed as adding another kind or class to those previously mentioned. Moreover, each particular word is so mentioned as to include all of the kind or class. Not merely "saws," but "all saws," are to be "properly guarded," and so as to "planers, cogs, gearing, belting, shafting, set screws." The several subjects are exhausted so that, if "machinery of every description"

were to be restricted to that of the kind previously enumerated, these words would add nothing and would be meaningless. This was recognized in *U. S. Cement Co. v. Cooper*, 172 Ind. 599 (88 N. E. 69), in construing a statute like ours, save "vats, pans" are included in the enumeration, where receding from the holding in *La Porte Carriage Co. v. Sullender*, 165 Ind. 290 (75 N. E. 277), the court said: "If all vats, all saws, all planers, etc., shall be properly guarded, that is the end of it. All vats, all planers, etc., mean vats and planers of every description that may be properly classified as such. The term 'all' qualifies each class or *genus* of things here specified, and we necessarily must imply that nothing remains of either class *ejusdem generis* for the general words of the phrase to embrace."

The rule was lucidly stated in *Ward v. National Lumber Co.*, 54 Wash. 304 (103 Pac. 1), though the statute of the state of Washington is more specific than that of Indiana or of this state. The complainant's left hand was caught between a grease cut and a friction wheel and torn off. The court, after quoting the statute providing "for reasonable safeguards for all vats, pans, trimmers, cut-off, gang edger, and other saws, planers, cogs, gearings, belting, shafting, coupling, set screws, live rollers, conveyors, mangles in laundries, and machinery of other and similar description" (Laws 1905, c. 84, section 1). Proceeding:

The appellant invokes the rule of *ejusdem generis*, and insists that the friction wheel, not being specified in the factory act, and not being the same kind or *genus* as any of the machinery specially mentioned, does not fall under the head of machinery of other or similar description, and that therefore the assumption of risk attaches in this kind of a case. Considering the whole scope of the factory act and the evident intention of the Legislature, we are unable to reach the conclusion contended for by the appellant. There is no doubt that the general rule is that the general word must take its meaning and be presumed to embrace

only things or persons of the kind designated in the specific words; but, as said in 26 Am. & Eng. Ency. Law, page 610, the object of the rule in question being not to defeat, but to ascertain and effectuate, the legislative intent, it will not be applied where the application would be in the face of the evident meaning of the framers of the law. In other words, the maxim has no application where there is no room for construction, but only when the meaning is not apparent from the language itself.

And it is also said: "Nor does the rule obtain where the specific words signify subjects greatly different from one another, for here the general expression might very consistently add one more variety; in such case the general term must receive its natural and wide meaning." This is peculiarly the case under our statute, where the specific words signify subjects greatly different from one another, vats, pans, trimmers, cut-off, gang edger, and other saws, planers, cogs, gearings, belting, shafting, coupling, set screws, live rollers, conveyors, mangles in laundries, etc.; all, or nearly all, being machinery or parts of machinery of different character. We think, in the face of the statute, it would be doing violence to the evident intention of the Legislature to hold that the duty to guard the machinery in question was not imposed upon the mill-owner, and the testimony is undisputed that the machine could have been guarded without affecting the efficiency of its operation.

Enough has been said to indicate the reasons for our conclusion that the clause "machinery of every description" should not be restricted to the kinds or class particularly mentioned, but given the broad construction, evidently intended by the Legislature, as meaning all machines of a character dangerous to employees operating them or working in their vicinity. Machines or parts likely, if unguarded, to injure those operating or coming in contact with them, are particularly mentioned and directed to be "properly guarded," and by "machinery of every description" the Legislature undoubtedly intended machinery

not specifically enumerated, but which might reasonably be anticipated to cause injury unless provided with appropriate guards.   See *Kimmerle v. Dubuque Altar Mfg. Co.,* 154 Iowa, 42.

As every one knows, a large percentage of machinery requires no shield against danger to workmen operating or near it, and this, as plainly appears from the statute when construed as a whole, was not contemplated by the Legislature.   When a machine, or machinery, however, is proven to be of a character such that injury therefrom to employees operating or near it is reasonably to be apprehended, then the statute exacting proper guards is as mandatory as though it had been particularly mentioned therein.

2. Same.

This necessarily results from the language of the statute, which is fairly susceptible of no other construction and proof that machinery is of the kind mentioned and is unguarded makes out a *prima facie* case of negligence. *Stephenson v. Brick & Tile Co.,* 151 Iowa, 371; *U. S. Cement Co. v. Cooper, supra.*

Manifestly, it was impracticable, if not impossible, for the Legislature to have enumerated all machinery which it intended to compel those operating factories to guard. Moreover, new machines are being almost daily added to those employed in producing an infinite variety of results. "The term machine includes every mechanical device or combination of mechanical powers and devices to perform some function to produce a certain effect or result." *Corning v. Burden,* 56 U. S. 252 (14 L. Ed. 683); *Westinghouse v. Boyden Power Brake Co.,* 170 U. S. 537 (18 Sup. Ct. 707, 42 L. Ed. 1136).   It has also been defined as "an instrument composed of one or more of the mechanical powers and capable when set in motion of producing by its operation certain predetermined physical effects." *Frederick R. Sterns & Co. v. Russell,* 85 Fed. 218 (29 C. C. A. 121). Under these definitions, there can be no doubt that the

traveling crane is a machine, and the evidence was such that the jury should have found, as they did, that it is such a one as that injury is reasonably to be apprehended therefrom to those working in its vicinity unless it be provided with proper guards. Concerning the nature of these guards and feasibility of their use, there was no dispute.

But the crane was operated about fourteen feet above the floor. Was its location such as to relieve the defendant from the duty of providing it with proper guards? It will be observed that the matter of location

3. SAME.

is not alluded to in the statute, for the very manifest reason that scarcely any machinery in a factory does not at times require attention and handling. The Wisconsin statute exacts that the machinery be "securely guarded or fenced," only when so located as to be dangerous to employees in the discharge of their duty," and decisions of that state are perhaps explainable because of this language. *West v. Mill Co.*, 144 Wis. 106 (128 N. W. 992); *Willette v. Paper Co.*, 145 Wis. 537 (130 N. W. 853).

In *Dillon v. National Coal Tar Co.*, 181 N. Y. 215 (73 N. E. 978), a shaft fourteen or fifteen feet high was held to be too high to be within the factory act, relying on *Glen Falls P. C. Co. v. Travelers' Ins. Co.*, 162 N. Y. 399 (56 N. E. 897), where the facts were that a revolving shaft extended through the building, fifteen or eighteen feet from the floor, at the end of which there was a collar to prevent an end thrust. This collar was fastened to the shaft by a set screw which projected about five-eighths of an inch from the collar and was immediately joining the bearing upon which the shaft revolved. Upon this bearing was constructed a small platform which was reached by a ladder, which was used only for the purpose of reaching the platform when necessary to oil the bearing. Jasmine ascended the ladder to the platform, as was his duty, and undertook to oil the shafting at the point of the bearing,

when his sleeve was caught by the set screw, and he was twisted around the shafting to his injury. The statute of New York, in requiring set screws to be properly guarded, is in the language of that of this state, and, in declaring that the jury might have found that the set screw was properly guarded, the court said:

The manifest purpose of the enactment was doubtless to give more force to the existing rule that masters should afford a reasonably safe place in which their servants are called upon to work. We think, however, that the Legislature could not have intended that every piece of machinery in a large building should be covered or guarded. This would be impracticable. What evidently was intended was that those parts of the machinery which were dangerous to the servants whose duty required them to work in its immediate vicinity should be properly guarded, so as to minimize, as far as practicable, the dangers attending their labors. Human foresight is limited, and masters are not called upon to guard against every possible danger. They are required only to guard against such dangers as would occur to a reasonably prudent man as · liable to happen. *Cobb v. Welcher,* 75 Hun, 283 (26 N. Y. Supp. 1068). In this case, as we have seen, the shafting was located from fifteen to eighteen feet above the floor of the factory, and the collar containing the offending screw was at one end of the building high above and out of reach of the servants who were engaged in operating the machinery below. It could only be approached by a ladder, and the only necessity of approaching it at all was for the purpose of oiling the bearing under the shafting. It does not appear that any accident of this character had ever happened before at this bearing, or that it had ever occurred to any of the persons operating the factory that such an accident was possible or liable to occur. The statute does not attempt to specify how machinery shall be guarded otherwise than as 'properly guarded.' The necessity for the guard, and the character and description of the guard, must, of. necessity, depend upon the situation, nature, and dangerous character of the machinery, and in each case becomes a question of fact. We think, under the evidence in this case, a question of fact was presented for the determination of the trial court,

and that it could not be held, as a matter of law, that the screw in question was not properly guarded.

The opinion proceeds as though the statute did not exist, but the conclusion as announced, though not so construed in *Dillon v. National Coal Tar Co., supra,* is not unreasonable for the issue as to whether the location' was a proper guard might well, under different circumstances, have been thought appropriate for a jury.

But the set screw was without guard, save that of location, and the performance of the duty of the employee, regardless of the location, exposed him to the particular peril against which the statute must have been designed to afford protection. As observed by the court, the intention of the lawmakers was not that every piece of machinery be guarded; but there is no room to doubt that such was the intention with respect to every piece enumerated in the statute. Nor has the Legislature designated the location at which a piece of machinery shall be placed in order to be within the statutory language, and there is no ground for saying that, where employees in the performance of their duties are exposed to the danger of being injured thereby, the proprietor shall be excusable for not providing proper guard whatever the location. This statute was not enacted merely as an expression of the common law, but as something in addition thereto, and to compel the proprietors of shops and factories to exercise something of that foresight and sagacity in the protection of their employees from injury which is habitually practiced in the achievement of business success. This subject in connection with the Dillon opinion was considered in *Casper v. Lewin,* 82 Kan. 604 (109 Pac. 657) where the court, speaking through Burch, J., said:

Taking up the argument of this opinion step by step, it may be observed that it proceeds upon precisely the same lines as if the statute did not exist. The practicability of safeguards for dangerous machinery does not depend on

the size of the factory or the number of pieces of machinery inside of it, but upon the nature of each machine. The question is: Is the machine or appliance of such nature that it is practicable to deprive it of its homicidal attributes and not destroy its usefulness? If so, it ought to be guarded, and all such pieces ought to be guarded, although a great many are assembled in one large building. The shaft bearing had to be oiled just as the crusher had to be operated, and the ladder and platform were provided for the purpose of conducting the oiler to the necessary place. The oiler was obliged to do the work of oiling the bearing in the 'immediate vicinity' of the set screw in the revolving shaft. The statute named set screws and shafting as appliances to be properly guarded so as to minimize the danger attending the labor of the oiler while at work in their immediate vicinity. It did not require superhuman powers, and would not have caused brain fag to foresee that a set screw projecting from a revolving shaft threatens danger to an employee obliged to work immediately adjoining them. The Legislature had that much pre-vision. That body put set screws and shafting in the category of dangerous devices to be properly guarded when in proximity to places where labor must be performed, and thereby established the measure of prudence to be exercised. The location of the shafting had nothing to do with the case. It made no difference whether the shafting were brought down to the floor, or the floor were taken up to the shafting by means of the ladder and platform. Of course, the shafting was out of reach of persons operating machinery on the floor and who had no business with it; but it was not out of reach of the oiler, who did have regular business with it. Since it was imperative that the set screw in the shafting should be approached, it was immaterial whether it were approached on a platform reached by a ladder or on the floor level. True, the only necessity for approaching the dangerous appliance was to oil the bearing; but that was a necessity just as much as attending to the crusher below, and, whenever the operation was performed, it was attended with danger. It is indeed true that a human being must be mangled before it occurs to some factory owners that a set screw in a rapidly revolving shaft is dangerous to the person who must work near it, and that is the reason why

the statute required it to be guarded.  There was no dispute about the situation, nature, and dangerous character of the set screw.  No attempt was made to meet the peremptory terms of the statute and provide a guard for it.  That it was plaintiff's duty to bring himself in proximity to it was not questioned; consequently, there was nothing left but to declare that a statutory duty had been violated.  No reasons other than those considered having been stated in support of the decision, this court is unable to follow it.

The traveling crane was far above the floor, but this alone did not obviate the necessity of proper guards.  If its location was such as in itself to shield it from injuring those employed in the shop, this would suffice.  But this is not necessarily so when the workman's duty in the course of his employment takes him within the danger zone, and this was reasonably to be expected in equipping the shop with the crane.  The safety appliances are exacted by the statute quite as much for the protection of the oiler or repairer, who in mending other machinery occasionally is exposed to the dangers of coming in contact with machinery as those who operate or constantly work about it.  The law does not discriminate between different employees or classes of employees, and if the proprietor of shop or factory would economize by omitting guards when the machine or parts of it, though seldom approached, are such that these are exacted by the statute, he must either stop the machinery when employees are exposed thereto, or provide adequate warning to these of the peculiar danger involved if he will shield himself from consequences in the way of damages.

As said in *Casper v. Lewin, supra*:

It may be conceded that one way of preventing injury from shafting, set screws, and other appliances is to locate them out of reach.  But they are not out of reach whenever a workman's duty in the course of his employment takes him to them.  Whenever such an occasion arises, the statutory duty to interpose safeguards between the workman and danger arises.  Dillon was obliged to work where un-

guarded shafting in motion would seize his clothing. The Legislature had his situation in mind when the statute was framed. The foreman had the choice of stopping the machinery or running the risk of inflicting a personal injury in violation of law. He chose the latter course, the result followed which the Legislature had foreseen and had tried to circumvent, and the injured man ought to have recovered.

Such machinery by virtue of the statute, when not properly guarded and in operation, is unsafe to those whose duties bring them within the zone of danger, whether this be on the floor or many feet above it, and when employees are required, in the performance of their duties, to work above the floor in the proximity of machinery which but for its elevation must have been guarded, it is the master's duty to take all necessary precautions for their protection in rendering the place at which they are engaged reasonably safe.

Reverting to the statement of facts, it will be recalled that Kay, who was in charge of the three-ton crane, was not negligent. He was not aware that any one was working near the track over which it moved and had not been directed to keep a lookout which ordinarily was unnecessary, and he could not well have noticed plaintiff from his location when operating it.

Nor can it be said that plaintiff was at fault in taking hold of the track in order to pull the riveter crane over so the wheels would rest on its track. True, he might have stood with his face toward the three-ton crane, and in that situation would have observed its approach, or he might have caused the large crane to move the riveter crane opposite the post and could have seized it in order to pull the latter over, but he saw the three-ton crane with no one in or near it, and, as the time was after working hours, he quite naturally supposed it was stationary and danger was not to be ap-

4. SAME: contributory negligence.

prehended therefrom. In proceeding on this theory, he can not be said as a matter of law to have been negligent, and might have been found to have been performing the duty required of him in the manner which might reasonably have been anticipated by defendant.

If he was not, then the injury must be regarded as purely accidental, or caused by negligence in failing to warn him of the approach of the three-ton crane or in 5. SAME: safe  ordering him into a dangerous place in which place to work:  to work. But the place was dangerous only submission of issue.  because of movement of the unguarded crane, and for this reason all necessary to render it reasonably safe was timely warning of its approach. In other words, to render the place reasonably safe, provision for warning of the approach of the crane might have been found to have been essential, and, if so, its omission constituted negligence. The seventh instruction was in accord with this conclusion, the court saying:

Was it negligence  on· the part of the· defendant to operate such an electric crane as the three-ton crane in question after regular work hours, without any warning or instruction to the plaintiff in reference thereto? The answer to this question depends upon whether or not the defendant in the exercise of ordinary care should have reasonably apprehended that the plaintiff, engaged in the performance of his duty on or about the riveting crane and exercising ordinary care for his own safety, would be endangered by such operation of the said three-ton crane. Unless you find that the defendant should reasonably have apprehended such danger to the plaintiff or other workmen similarly employed, you can not find it negligent, and the plaintiff can not recover.

In *Michael v. Roanoke Mach. Works,* 90 Va. 492 (19 S. E. 261, 44 Am. St. Rep. 927), an employee was directed to empty certain oil pans fixed under a shafting about two and one-half feet below the track of a crane some twenty-five feet above the floor. To do this "he had to sit down

on the wall with his feet and legs hanging over the side of it, then hang his right arm across the rail, and with his left hand reach down and take off the buckets" or pans. When he was trying to unfasten the third pan, the crane, which he had supposed was standing, was run on his arm without any warning and crushed it. So operating the crane, regardless of a safety appliance law, without warning, was held to be negligence.

In *American Tin Plate Co. v. Smith,* 143 Fed. 281 (74 C. C. A. 419), a scaffolding had been hung from the roof near one of the girders or I-beams from twenty to twenty-five feet from the ground upon which workmen might stand while engaged in drilling holes through the said beam. Complainant, to reach the scaffold, climbed up a post; but, after working awhile, the tool used broke, and he was obliged to go down to have it mended. In doing so he worked his way along the beam with feet partly on its lower flange and his arm across the top to hold himself in position. "When he reached the post supporting the beam and which extended upwards to the roof, he threw one arm around the post, still holding the other across the top of the beam, but preparing to remove it in order to slide down on the post to the ground. While in this position, the crane moved along from the direction in which he had come, striking his arm without his having been warned of its approach," seriously injuring him. With reference thereto the Circuit Court of Appeals, speaking through Gray, J., said: "Was any provision made by the defendant to warn those within the danger of the approach of the crane, and, if not, was plaintiff informed that no such provision was made, and of the danger incurred thereby? Had he the right to assume that the defendant would provide for such warning, and to act accordingly? These questions were all involved in this second alleged ground of liability. The plaintiff was clearly entitled to have this ground of liability, as alleged in his declaration, considered,

and defendant was equally entitled to have the ground of liability correctly stated to the jury. For the reason that it was erroneously stated by the learned judge, the defendant should be accorded the opportunity to have the law and facts that are properly determinative of his liability presented to the jury."

Enough has been said to dispose of appellant's contention that McCarney was exposed to a transitory danger due to no fault of plan, construction, or lack of repair, and for this reason might not recover. All that plaintiff did in following the crane was of a transitory nature, and the mere fact that in the performance of his duty he was compelled to go from place to place did not exclude him from the protection of the statute exacting proper guards nor deprive him of the benefit of the rule exacting a reasonably safe place in which to perform his duties. The statute was not enacted for the workmen engaged in ordinary duties only. Were the question as to whether the protection designed by statute is or is not practicable or necessary for a particular class of employees a matter for determination of courts or juries in every case, confusion as to what is required would result, and the purpose of a beneficient law be largely if not wholly nullified. As the evidence that the machinery was of a nature exacting a guard and had none was conclusive, the only inquiry aside from that of contributory negligence was whether, in view of its location and the circumstances proven, the defendant in the exercise of reasonable care should have warned McCarney of the approach of the crane.

There was no error, and the judgment is—*Affirmed.*