JOSEPH WADDELL, by his next friend, C. F. Hambrecht, Appellant, v. BURLINGTON BASKET COMPANY.

**Master and Servant: NEGLIGENCE: EVIDENCE.** Where there is some peculiar danger arising from the operation of a machine, which an experienced workman acting within the scope of his employment would not be likely to appreciate, he is entitled to a warning by the master. In the instant case plaintiff was engaged in the operation of a saw set in a slit of a table, and in pulling a splinter from below, which was caught between the saw and the edge of the table, his hand was drawn against the saw and injured. *Held,* that the question of whether this danger was so open and notorious that the plaintiff was guilty of negligence, or such as to relieve the employer of the duty to warn him of the danger, was for the jury.

**Same:** An employer is not liable for negligence because failing to warn
2    a workman of a danger incident to the performance of duties as-
     signed to another, and entirely outside the scope is his own
     employment.

**Same:** GUARDING MACHINERY: NEGLIGENCE: EVIDENCE. The statute
3    requiring that saws with which workmen are employed shall be
     guarded contemplates that such guards as are practicable, and will
     not materially interfere with the efficient use, shall be placed near or
     over them in such manner, and shall be of such material, as will pro-
     tect employees using the same or coming in proximity therewith from
     being injured thereby. In the instant case the failure of defendant ·
     to protect the saw by a covering from all sides, three sides being
     protected, was not the proximate cause of plaintiff's injury.

*Appeal from Des Moines District Court.*—HON. W. S.
WITHROW, Judge.

FRIDAY, FEBRUARY 14, 1913.

FROM judgment on directed verdict for defendant, the
plaintiff appeals.—*Affirmed.*

*Hubbell & Hubbell* and *Wade, Dutcher & Davis,* for
appellant.

*Clark & Hutchinson,* for appellee.

LADD, J.—The defendant operates a basket factory, and
in June, 1911, employed plaintiff, then eighteen years of
age past, to work at what seems to have been called the "gang
saw table." This table was about four feet wide, and a little
longer than wide. The frame was of iron and about two and
one-half feet high, with a top which was adjustable, being
raised or lowered by a crank, so as to adjust the saws to
boards of different thickness. There was a slit near the center
of the table lengthwise about fifteen inches from the south
side, through which three saws attached to a shaft below
revolved. These saws were fourteen inches in diameter, and

about one-fourth of an inch apart, and ordinarily extended above the top three or four inches. They were properly covered above. A roller carried the boards or timber into the saws, and as they were sawed in strips these were carried through to the other end. There was an opening into the floor below into a suction pipe through which the sawdust was drawn out of the building by fans. Boards were at either end to run the sawdust down, and on the north side the space was covered with gearing. On the south side there was an iron below the top extending down about five inches, and one at the bottom, also five inches wide, about two and one-half inches above the floor. Plaintiff testifies that: ''At the south side of the table there was a leg five inches wide coming down from each corner. Then there is the circular part of the frame about two or two and one-half inches from the floor; that is, five inches wide going from leg to leg. This is on the south side of the table, or right-hand side of the table as I stood. There is also a frame in the center of the machine between the legs. It goes down from the top of the frame to the lower frame. This is five inches wide—same width as the legs. There is also a cross-piece at the south end running from the bottom of the west leg up to the top of the east leg. This cross-piece is an inch wide.'' He testified that otherwise the south side was open, but Fneske that it was covered by boards set in grooves. Fneske fed the strips as they came through, and plaintiff placed them on a truck, and handed any part not sawed back for Fneske to run through again. The plaintiff explained how the work was done, saying that Fneske:

Would start a board in at the feeder's side, and it would run against a straight edge and the saws would saw off three pieces, and I would receive the boards from the saw. The feeder would be handling three pieces of boards at the same time; I mean following each other. These being short pieces he would start them in, and the rollers or feeders would carry them through to my side. I would

get the strips and put them on the truck, and throw the board back. Would take the strips with the left hand and the board in the right hand. . . . At the time I was hurt we were sawing boards which had all been sawed to about two inches wide and about three inches thick, and about two feet long. They were making about three or four little slats out of one piece; they were coming right through one after the other, and as they came through I received them and put them on the buck. While I was doing this work I heard a buzzing. I reached down and pulled it out. I was standing facing the table at this end (referring to the trial table), and I reached down like that (indicating) to get hold of it, and started to get hold of it, and got it loosened up a little bit, and it jerked my right hand up into the saw. There was nothing below there to interfere with reaching under the saw from the side; nothing but the slanting board on the end and some sawdust in there. The stick was wedged in next to the level between that and the saw. I had to reach under the two saws. It came down below the saws about six inches. (The stick that was clogging the saw that I heard buzzing.) It was leaning a little toward me. I stooped down and reached under the table, and got hold of the stick about six inches below the edge of the saw, and then it all happened just in a second. I started to pull the stick down, and it just took my hand right up into the saw. Never pulled a stick out of the saws before, but I have seen others do it. I couldn't state his name. I was a stranger there. Fneske was the only one that worked about the saws while I was there. I have seen him pull these sticks out of the saws at other times; I can't say how many times. I couldn't very well describe the stick I started to pull out. I know it was about six inches below the saws. I believe it was a circular piece. . . . When I reached in there to get hold of the stick, Mr. Fneske was at the other end of the table. He said nothing to me, and I saw him do nothing. I didn't see him attempt to shut off the power. It wasn't stopped after I was struck to my knowledge. I went to the hospital, and was operated on by Dr. Lundy. The doctor cut off the two middle fingers.

The witness further testified that Fneske adjusted the table, and fed the boards in alongside of the guide on the north side, which was a piece of iron or steel, smooth and straight so as to maintain a straight edge upon the wood.

The saws were adjustable and Fneske adjusted them; in doing so, he would have to remove the blades, and in doing this would take a piece out of the table. There was a cross-section of the top of the table fixed so it could be taken out to adjust the saws. . . . At the right hand of Fneske as he was feeding the machine was the belt shifter and lever, coming down from the countershaft from which he started and stopped the saw. . . . John Fneske did all the work about the saw except the taking of the boards away as was heretofore explained which was done by me.

On-cross-examination the witness testified further that, when he heard "whirring noise or buzz of some kind," he looked and saw the sliver next to the guide, and stepped around the corner of the table, "looked under the frame, looked clear under there, and saw the saws revolving and reached my left hand under the saws to get hold of the stick; had a cotton glove on. I got my hand down far enough so I could see clear under the frame, and see the saws and the end of the stick, and reached my hand right under these revolving saws, and got hold of the end of the stick; it jerked my hand up in there. This was the first time I ever did that." As the lumber was green the sawdust was usually wet, and he had pushed it through a hole with a ten-foot pole, and also had frequently done so with his hand. The plaintiff had had no previous experience in the operation of a saw, and had been in the employment of the defendant but three months. He appears to have been of average intelligence. The superintendent in employing him told him that Fneske would feed the boards through the machine, and that he should take the strips as they came through the saws, and put them on a truck, and hand the pieces unsawed back to Fneske, so he could put them through again. He gave him no instructions as to anything save that he should stand in front of the machine, and receive the slats and boards.

Such is the evidence in so far as material to the determination of the questions presented. The grounds of negligence alleged in the petition were: (1) That defendant

failed to comply with the statutes requiring the saws to be properly guarded; and (2) failed to instruct or warn plaintiff of the dangers involved in the operation of the saw. On the other hand, it insisted that plaintiff was guilty of contributory negligence. These propositions may be separately considered, and, for convenience, in reverse order.

I. It is to be inferred from the evidence that splinters were frequently caught between the saw and the straight edge, for plaintiff testified that he had seen Fneske remove them in the way he attempted. That the saws extended below the top and revolved was as well known to plaintiff as to the superintendent, and he knew as well as any one the danger to a hand coming in contact therewith. What he may not have known was the danger in pulling on a splinter from below, of the teeth of the saw catching it, and carrying the hand against the saws. An inexperienced person would not be likely to appreciate the peculiar danger from this source. Because of the natural effort to retain the stick upon being caught by the saw, the hand likely would be drawn in, and this was a danger of which plaintiff might have been found, if acting within the scope of his employment, entitled to warning. *Wilder v. Great Western Cereal Co.*, 130 Iowa, 263. See, also, *Martin v. Madden Shingle Co.*, 168 Mich. 175 (130 N. W. 615); *Mastey v. Villaume Box & Lumber Co.*, 104 Minn. 186 (116 N. W. 207); *Barg v. Bousfield*, 65 Minn. 355 (68 N. W. 45); *Harkins v. Veness Lumber Co.*, 69 Wash. 196 (124 Pac. 492); *Harney v. Railway Co.*, 139 Iowa, 361. Doubtless Fneske removed the sliver by jerking it quickly and letting go, and thereby avoiding the danger of injury to which plaintiff was exposed. In other words, the injury was incident not so much in what was attempted as in the manner of doing it, and, of course, such a danger cannot as a matter of law be said to have been open and obvious. If the plaintiff in doing what he did was acting within the scope of his employment, we think the issue as to contributory negli-

1. MASTER AND SERVANT: negligence: evidence.

gence fairly for the jury, and the danger one of which the jury might have found he should have been warned.

II. A more serious question is whether in undertaking to remove the splinter the plaintiff was acting within the scope of his authority. The evidence leaves no doubt but

2. SAME.

that he was neither directed to do this nor to push the sawdust down the pipe with a stick or by hand, and the fact that the superintendent in directing him what to do said nothing of these matters, but required him merely to remove the slats to the truck, and hand the unsawed part of the board or timber back to Fneske, tends to negative any inference that he was to do something else. To remove the splinter then was no part of plaintiff's duty, and the master having instructed him specifically what was required was under no obligation to direct him concerning that which neither of them could well have expected he would undertake. True, these men were working at opposite ends of the same table in plain view of each other, but each with his particular duty assigned. Fneske operated the saws, and had previously removed the splinters as was his duty, and plaintiff in attempting to do this was quite as much outside the scope of his employment as though he had undertaken to operate the saws in Fneske's stead, or had stepped to another machine nearby and tried to do something in connection therewith. See *Stodden v. Anderson Mfg. Co.*, 138 Iowa, 398. The defendant through its superintendent was not required to instruct or warn him of the danger in doing something for which he was not employed; and, even though in a spirit of helpfulness he undertook the work not exacted from him, he did so at his own and not at the master's risk, and therefore is not in a situation to complain of any omission of his employer to properly instruct him. In other words, the defendant cannot be held to have been negligent in not instructing the plaintiff of the danger involved in undertaking to perform the work of another, and the trial court rightly so held.

III.   Nor do we think it should be said that as to plaintiff these saws were not properly guarded.   They are conceded to have been covered on three sides and on top.   The

3. SAME: guarding machinery: negligence: evidence.

only question then is whether they were properly guarded on the south.   An iron plate, as appears, extended from the top of the frame down about five inches, and from one leg to the other and one at the bottom of the same width two and one-half or three inches above the floor.   The legs at the corners were about .five inches wide, and at the center there was an iron plate which extended from the top of the frame down to the cross-plate below, which was about five inches wide.   Besides there was a cross-piece from one end running diagonally "from the bottom of the west leg up to the top of the east leg" about one inch wide.

The annexed photograph indicates better than words the covering afforded:

The saws were fifteen inches back from the south edge of the frame. Manifestly, an employee at the table in the performance of his duties would not ordinarily come near enough to the saw below to be drawn in contact therewith unless such were his purpose; and, of course to such a one, the movable covering would furnish no protection, for if bent on reaching the saws the covering would merely involve removal of the covering in order to reach them. Indeed, Fneske testified that boards were set in grooves in the iron plates, and that these covered the south side at the time of the injury, and, if this were so, plaintiff must have removed the boards to do precisely what he undertook to do in the absence of covering, according to his testimony. What difference can it make whether plaintiff were injured in trying to remove a splinter when there was no other guard on the south, or when there was a guard, and he had removed it before the attempt to take out the splinter? Any guard which was practicable would not have obviated the danger in actually removing the splinter or have prevented the attempt from so doing, though it possibly might have served as a danger signal. The design of the statute exacting that all saws shall be properly guarded is that something shall be placed near to or over them in such a manner and of such material as to protect employees coming in proximity therewith or using them from being injured thereby. As said in *Kirchoff v. Creamery Supply Co.*, 148 Iowa, 508, a saw is "properly guarded when the device attached is of material and construction, such as will shield those operating it or moving near it from contact therewith when in motion, at least when practicable without unreasonably interfering with the efficiency of the machine. If not reasonably suitable and calculated for this purpose, the cover is not proper, and the proprietor, in omitting to obey the mandate of the statute, is guilty of negligence." See, also, *Miller v. Cedar Rapids Sash & Door Co.*, 153 Iowa, 735; *McCarney v. Bettendorf Axle Co.*, 156 Iowa, 418. It is apparent from the description of the

table that no other protection was essential to shield those ordinarily. working at or coming in proximity to the table from injury. The room was filled with all sorts of machinery, and employees as well as others were aware that this was likely to be at any table or bench, and the defendant was not required to anticipate that workmen employed otherwise in approaching this one would be likely to crawl or reach under it so as to come in contact with the saws when in motion. Green boards or timber were sawed that the slats might be. more easily bent, and therefore the sawdust was damp, and it was frequently necessary to crowd it with a stick or by hand down the pipe, and it would not seem to the majority of the court practicable in view of this to stop to remove the boards from the south side every time this was necessary. No other shield then was required to protect the workmen not required to reach under the table or those coming near from the danger of contact with these saws extending below the top; but, if this were not so, any guard that might have been devised would necessarily have to be removed in extracting a splinter, so that, whatever device were employed, this would not shield those operating the saws or moving near them from exposure to the hazard in attempting to extract a splinter when caught between the saw and straight edge. Therefore it cannot be said that the plaintiff's injury was the proximate result of any omission to guard the saw.

We reach the conclusion on these grounds that the court rightly directed the jury to return a verdict for the defendant.—*Affirmed.*