## UNITED STATES GYPSUM CO. v. KARNACA.

### (Circuit Court of Appeals, Eighth Circuit. July 29, 1914.)

### No. 4096.

1. MASTER AND SERVANT (§ 121*)—PLACES TO WORK—STATUTE REQUIRING GUARDING OF MACHINERY.

Code Supp. 1907, Iowa, § 4999a2, which makes it the duty of the owner of any manufacturing or other establishment where machinery is used, among other things, to properly guard "machinery of every description," as construed by the Supreme Court of the state, is intended to require the guarding of all machines of a character dangerous to employés operating them or working in their vicinity.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 228–231; Dec. Dig. § 121.*]

2. MASTER AND SERVANT (§ 289*)—ACTION FOR INJURY TO SERVANT—QUESTIONS FOR JURY.

Evidence considered, and held not sufficient to establish the contributory negligence as a matter of law of an employé in a gypsum mill, who was injured by a revolving screw, used to force gypsum through a conveyor, and which was left unguarded through the employer's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. § 289.*]

In Error to the District Court of the United States for the Northern District of Iowa; Henry T. Reed, Judge.

Action at law by Peter Karnaca against the United States Gypsum Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Fred J. Dawley, of Cedar Rapids, Iowa (Dawley, Jordan & Dawley, of Cedar Rapids, Iowa, on the brief), for plaintiff in error.

B. J. Price, of Ft. Dodge, Iowa (M. M. Joyce, of Ft. Dodge, Iowa, on the brief), for defendant in error.

Before SANBORN and CARLAND, Circuit Judges.

CARLAND, Circuit Judge. This action was brought by Karnaca to recover damages from the Gypsum Company for a personal injury he received while in its employ, and which as he alleges was caused by the negligence of the company. He recovered a verdict. The company brings the case here, assigning as error the ruling of the trial court

refusing to direct a verdict in its favor. The company has specified the particulars in which the evidence was insufficient to sustain a verdict as follows: (1) There was no evidence for the jury that the company was negligent. (2) There was no evidence for the jury that the machinery on which Karnaca was· injured was of a such a dangerous character as to require a guard. (3) There was no evidence for the jury that it was practicable to guard the conveyor without interfering with the operation thereof. (4) The evidence showed Karnaca to have been guilty of contributory negligence. Karnaca specified in his complaint as acts of negligence: (1) Failure to use ordinary care to furnish him with a reasonably safe place to work. (2) Failure to use ordinary care to furnish him with proper tools and appliances to remove the clogged gypsum without being compelled to place his hands in close proximity to the unguarded revolving conveyer screw. Under specification 1, Karnaca mentioned the failure to properly guard the conveyer screw as provided by section 4999a2, Supplement, Iowa Code. (3) In permitting an obstruction to remain over and across the door of bin No. 5, thereby causing Karnaca to place his hands near the conveyer screw. (4) Failure to warn Karnaca of the dangers of his employment.

[1] Section 4999a2, reads as follows:

"It shall be the duty of the owner, agent, superintendent or other person having charge of any manufacturing or other establishment where machinery is used, to furnish and supply or cause to be furnished and supplied therein, belt shifters or other safe mechanical contrivances for the purpose of throwing belts on and off pulleys, and, wherever possible, machinery therein shall be provided with loose pulleys; all saws, planers, cogs, gearing, belting, shafting, set screws and machinery of every description therein shall be properly guarded."

In construing this statute the Supreme Court of Iowa, in McCarney v. Bettendorf, 156 Iowa, 418, 136 N. W. 920, said:

"Enough has been said to indicate the reasons for our conclusion that the clause 'machinery of every description' should not be restricted to the kinds or class particularly mentioned, but given the broad construction, evidently intended by the Legislature, as meaning all machines of a character dangerous to employés operating them or working in their vicinity. Machines, or parts likely, if unguarded, to injure those operating or coming in contact with them, are particularly mentioned, and directed to be 'properly guarded,' and by 'machinery of every description' the Legislature undoubtedly intended machinery not specifically enumerated, but which might reasonably be anticipated to cause injury unless provided with appropriate guards. See Kimmerle v. Dubuque Altar Mfg. Co. [154 Iowa, 42], 134 N. W. 434: As everyone knows, a large percentage of machinery requires no shield against danger to workmen operating or near· it, and this, as plainly appears from the statute when construed as a whole, was not contemplated by the Legislature. When a machine, or machinery, however, is proven to be of a character such that injury therefrom to employés operating or near it is reasonably to be apprehended, then the statute exacting proper guards is as mandatory as though it had been particularly mentioned therein."

The court in the above case cited with approval the case of U. S. Cement Co. v. Cooper, 172 Ind. 599, 88 N. E. 69. The Indiana statute reads:

"All vats, pans, saws, planers, cogs, gearing, belting, shafting, set screws and machinery of every description therein shall be properly guarded."

The Supreme Court of Indiana in construing this statute said:

"Considering the general purpose of the legislation, as distinctly shown by the various provisions of the act, it becomes plain that the design of the lawmakers was the selection of certain manufacturing instrumentalities, generally known to be dangerous, and susceptible of being guarded without impairing their usefulness, and the imposition upon masters of the general duty of properly guarding all such instrumentalities, on the penalty that failure to do so should be accounted negligence per se. While the great body or mass of machinery usually assembled in important manufacturing establishments—too multiform and diversified for classification or just control by fixed rules of law—should be understood as being within the scope and meaning of the general words, 'and machinery of every description therein' shall be guarded, this distinction, however, in the rules applicable to objects within the purview of the general words, is manifest. The failure to guard all machinery is not negligence per se. When a machine, or some part of a machine, is not of a dangerous character, or is so located as not to imperil workmen when in the place, or places, to which their duties call them, or where guarding or fencing is impracticable without materially impairing the use, the same need not be guarded."

The trial court in the case at bar told the jury that the statute of Iowa required the revolving screw which injured Karnaca to be guarded. Whether it appeared that the machinery was so clearly dangerous as to allow the court to say that it was within the statute (Kimmerle v. Dubuque Altar Mfg. Co., 154 Iowa, 42, 134 N. W. 434), we may not consider, as there was no exception or complaint made when the court so charged.

Chapter 219, Acts 33d General Assembly of Iowa, provides:

"That in all cases where the property, works, machinery, or appliances of an employer are defective or out of repair, and where it is the duty of the employer from the character of the place, work, machinery or appliances to furnish reasonably safe machinery, appliances or place to work, the employé shall not be deemed to have assumed the risk by continuing in the prosecution of the work, growing out of any defect as aforesaid, of which the employé may have had knowledge when the employer had knowledge of such defect, except when in the usual and ordinary course of his employment it is the duty of such employé to make the repairs, or remedy the defects. Nor shall the employé under such conditions be deemed to have waived the negligence, if any, unless the danger be imminent and to such extent that a reasonably prudent person would not have continued in the prosecution of the work; but this statute shall not be construed so as to include such risks as are incident to the employment."

The law and the issues being as stated, it simply remains to consider whether there was evidence to sustain a verdict for Karnaca in the particulars specified. We are justified in saying that there was no evidence to sustain a recovery on the ground that the company had not used ordinary care in providing Karnaca with reasonably safe tools and appliances with which to perform his work. Counsel for Karnaca practically concede this in their brief. The question was submitted to the jury, however, by the court, but no complaint is made of this anywhere. If there was evidence to go to the jury on any alleged act of negligence, it was not error to overrule the motion for a directed verdict. In order to have brought this question before us for review, there ought to have been a motion to direct a verdict upon this particular cause of action—none such was made. There was conflicting evidence as to what the company did in warning Karnaca of the dangers of his

service. Beside stating that this was one of Karnaca's alleged acts of negligence on the part of the company the court said nothing about it to the jury. No complaint, however, of this is made. There was evidence to go to the jury that the screw conveyer was of such a character that injury therefrom to employés near it would be reasonably apprehended. As before stated, the court decided this question, and no complaint of that decision is made. The claim that there was no evidence that it was practicable to guard the conveyer without interfering with the operation thereof is not sustained by the record. Mr. Butler, superintendent of the Gypsum Company, called by Karnaca, testified upon this subject as follows:

"Q. If the men properly regulated the flow of the gypsum by means of these slides, as they do now, the presence of the screen over the conveyer would not in any way tend to retard the flow of the gypsum, would it? A. Some kind of a screen would; a real fine screen would. Q. Will a coarse screen? A. It wouldn't; no, sir.

"By the Court: Q. A coarse screen would not? A. No, sir."

[2] It necessarily results from what we have said that there was evidence that the defendant was negligent. There was no pretense that any guard had been placed over the conveyer screw for the purpose of protecting employés. It only remains to consider the question as to whether the testimony so clearly showed that Karnaca was guilty of contributory negligence that a verdict for him could not be sustained. The burden of showing that Karnaca was negligent was upon the company, unless it appeared from Karnaca's own evidence, and the court in order to have directed a verdict for the company on that ground, as matter of law, would have had to decide that all reasonable men upon the facts shown would say that Karnaca was negligent. It now appears that 12 men, presumably reasonable, united in finding to the contrary. In order to discuss this question a short statement of the case is necessary.

The Gypsum Company is engaged in the manufacturing of gypsum products near Ft. Dodge, Iowa. Karnaca was employed by it about July, 1912, and on September 11th of the same year received the injury of which he complains, in what is known as the Mineral City Mill. In this mill there were six kettles for boiling the moisture out of gypsum plaster. When the plaster is boiled sufficiently it is dumped into bins. This is done by opening a gate that is on a level with the bottom of the kettle. The bins are shaped like an inverted "A." They were of about 18 tons capacity. When the plaster is first dumped from the kettle to the bin, it has a temperature of about 330 degrees Fahrenheit, and is of the consistency of hot water. The plaster passes from the bins to a conveyer box through doors located at the bottom of the bins, and then is conveyed by the operation of a screw conveyer to an elevator. The conveyer box is 16 inches wide and 24 inches deep, with flat bottom and no cover or top. Inside of the conveyer box is a conveyer screw 9 inches in diameter and 28 inches in circumference. The screw is about six inches from the bottom of the conveyer box and the box is about 60 feet in length. The screw revolves at the rate of 80 revolutions per minute. The doors or gates at the bottom of the bin through which the gypsum passes are about 6 inches by 12 inches. The top of the

outside of the conveyer box is about 4½ feet from the floor and came up to about the shoulders of Karnaca. The doors in the bins are opened and closed by a sliding door, raised or lowered by the men operating same, either with their hands or by means of an iron bar. In drawing a line from the top of the conveyer box straight across horizontally to the bin, it would strike a little below the top of the door. There is a tendency for the hot fluid gypsum to cake or bake when dropped into these bins after it becomes cool. If the gypsum clogged in front of any one of the doors in the bins, the elevator man's duty was to loosen it up with the bar, which was furnished by the Gypsum Company. Karnaca was an elevator man, and this was a part of his duty at the time of the accident. This iron bar was about 5 or 6 feet in length and of half-inch pipe. The end that went into the bin was crimped shut. The bar was curved, but was made of light material so that you could straighten it if desired. As a general thing it would be curved. If the gypsum clogged it was easier and safer to get at it with a curved bar than with a straight bar. The bar would be inserted in the sliding door. The clogs or jams of the gypsum would sometimes be three or four feet up in the bins from the door. The colder the gypsum became the harder it packed. The conveyer screw runs all the time when the mill runs, so that whenever a person would be poking these clogs the conveyer screw would be in motion in front of him all the time. Some time before the day of the accident, the company had attempted to have the gypsum pass automatically from the bins into the conveyer box, and to that end had covered the conveyer box, and as a part of this scheme there was a plate placed in front of the bin door. It covered up part of the opening. The object of this experiment as claimed by the company was to save the expense of elevator men, but it was found impracticable, and the cover was taken off the conveyer box, but on some of the doors of the bins the plates remained. The plate remained at bin No. 5 where Karnaca was injured. There were holes in the plate top and bottom for inserting the iron bar to loosen the gypsum when it became clogged. It is the claim of the company that the length of the bar with which Karnaca was furnished permitted him, at all times, to poke the clogged gypsum without having his hands over the conveyer box or near the conveyer screw. Karnaca was not attempting to raise or lower any bin door with his hand when he was injured. He testified:

"I put the bar in as far as I could put it, and at those doors where there was no plate my hand would come right over the conveyer. At the time I was hurt I was using that pipe, cleaning with it. I was working on the third hole in bin No. 5. I put the bar in from the bottom underneath the plate, because the gypsum was stuck on the bottom. It was stuck or clogged at a point below the hole in the top of the plate. When it didn't block on the bottom, I used it on top. I took hold of the bar with my right hand in front and the left hand behind. I started to poke from the bottom and the conveyer caught my glove or the sleeve and just took my hand in there and then it cut my fingers off."

It is plain that the farther the iron bar was inserted in the bin for the purpose of breaking up the gypsum, the nearer the elevator man's hands would come to the conveyer screw, that is, they would be over the conveyer screw. The conveyer box was 24 inches deep, the diameter of the screw was 9 inches, and the distance from the bottom of

the screw to the bottom of the conveyer box was 6 inches. This would leave a space of 9 inches above the screw to the level of the top of the conveyer box. The side of the bin next to the conveyer box constituted the inside of the conveyer box, so that there was nothing to prevent the iron bar if it was inserted in the bin so as to come within the top opening of the conveyer box from getting down into the conveyer screw, which might have been possible if the elevator man was trying to reach clogged gypsum three or four feet up in the bin, and the testimony shows that it sometimes clogged as high as that.

There may be evidence appearing in this statement of the case which would sustain a verdict that Karnaca was negligent, but it does not present a case where the court can say as matter of law that he was. In order to do so we should have to decide that all reasonable men would say upon the facts stated that Karnaca could not have received his injury without he either deliberately or carelessly placed his hand so as to be caught by the conveyer screw. We think it was a question for the jury, and that their verdict must stand.

Judgment affirmed.